## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Mark Falk |
| | : | |
| v. | : | Mag. No. 17-3650 (MF) |
| | : | |
| VICTOR SANTOS, | : | CRIMINAL COMPLAINT |
| a/k/a "VITOR SANTOS," | : | |
| ARSENIO SANTOS, | : | |
| a/k/a "GASPAR SANTOS," | : | |
| FAUSTO SIMOES, and | : | |
| RAQUEL CASALINHO | : | |

I, Anthony Mangarella, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Housing Finance Agency Office of Inspector General, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

Anthony Mangarella, Special Agent
Federal Housing Finance Agency
Office of Inspector General

Sworn to before me, and
subscribed in my presence

October 13, 2017 at
Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

### Count One
### (Conspiracy to Commit Bank Fraud)

From at least in or around September 2007 through in or around November 2008, in the District of New Jersey and elsewhere, defendants

**VICTOR SANTOS,**
**a/k/a "VITOR SANTOS,"**
**ARSENIO SANTOS,**
**a/k/a "GASPAR SANTOS,"**
**FAUSTO SIMOES and**
**RAQUEL CASALINHO**

knowingly and intentionally conspired and agreed with each other and with others to execute a scheme and artifice to defraud a financial institution, as defined in Title 18, United States Code, Section 20, namely Victim Bank 1, whose deposits were insured by the Federal Deposit Insurance Corporation, and to obtain money, funds, assets and other property owned by, and under the custody and control of, said financial institution, by means of materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Anthony Mangarella, a Special Agent with the Federal Housing Finance Agency, Office of Inspector General ("FHFA-OIG"), am currently assigned to the Federal Bureau of Investigation ("FBI") as a Task Force Officer. I am familiar with the facts set forth in this Complaint based on my own investigation, conversations with other law enforcement officers, and my review of reports, documents, and other items of evidence. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described herein are related in substance and in part, and all dates and dollar amounts are approximate.

### Overview of the Conspiracy

1.      From in or about September 2007 through in or about November 2008, VICTOR SANTOS, ARSENIO SANTOS, RAQUEL CASALINHO, FAUSTO SIMOES, and others  (collectively, the "Co-Conspirators") engaged in a mortgage fraud conspiracy that caused millions of dollars in losses to Victim Bank 1.

2.      The Co-Conspirators used a variety of fraudulent documents and techniques to induce Victim Bank 1 to fund mortgage loans on approximately twelve properties in or around Newark, New Jersey (the "Newark Properties"), including, among other things: (a) using straw buyers; (b) executing and causing to be executed fraudulent sales contracts; (c) submitting and causing to be submitted false and fraudulent mortgage loan applications and related documents to Victim Bank 1; (d) providing down payments and other payments, purportedly from the straw buyers, but which in fact came from proceeds of fraudulent loans; and (e) using the fraudulently obtained loan proceeds for the Co-Conspirators' personal uses.

### Defendants and Relevant Individuals and Entities

3.    At various times relevant to this Complaint:

   a.      Defendant VICTOR SANTOS ("VICTOR"), a/k/a "Vitor Santos," was a real estate investor who resided in or around Watchung, New Jersey.

   b.      Defendant ARSENIO SANTOS ("ARSENIO"), a/k/a "Gaspar Santos," was the cousin of Defendant VICTOR, and a real estate builder and investor who resided in or around Warren, New Jersey.

c.      Defendant RAQUEL CASALINHO ("CASALINHO") was the niece of Defendant VICTOR and a Junior Home Mortgage Consultant at Victim Bank 1 who resided in or around Hillside, New Jersey.

d.      Defendant FAUSTO SIMOES ("SIMOES") was a real estate closing attorney with a New Jersey-based law firm ("Law Firm A") and resided in or around Millington, New Jersey.

e.      "Victim Bank 1" was a federally regulated national banking association, the accounts of which were insured by the Federal Deposit Insurance Corporation, making it a "financial institution" as that term is defined in Title 18, United States Code, Section 20.

f.      Co-Conspirator 1 ("CC-1") was the owner of Realty Company A and received proceeds from fraudulently obtained loans.

g.      Co-Conspirator 2 ("CC-2") owned a shell company, purportedly engaged in the business of construction ("Construction Company A"), and resided in or around Union, New Jersey. CC-2 participated in the recruitment of straw buyers, the purchase of cashier's checks for their cash required at closing, and the payment of their mortgages.

h.      Construction Company A was a shell company to which funds from fraudulently obtained mortgage loans were disbursed and from which straw buyers' down payments and closing costs were obtained. A bank account for Construction Company A was controlled by CC-2 and VICTOR.

i.      Avanti Builders, LLC ("Avanti"), was a builder of residential properties owned by ARSENIO which conducted business in New Jersey. A bank account for Avanti was controlled by ARSENIO and VICTOR.

j.      Avanti II is the name of a bank account controlled by ARSENIO and VICTOR.

k.      427 Lafayette Street, LLC was a business entity registered in New Jersey whose principals were ARSENIO and VICTOR.

### Overview of the Mortgage Lending Process

4.      At various times relevant to this Complaint:

a.      A Uniform Residential Loan Application Form 1003 ("Form 1003") was a standard form typically completed by individuals who sought to finance a real estate transaction.  The Form 1003 contained information about a loan applicant's identity, employment, income, assets, cash available at

3

settlement, and liabilities, among other things. The Form 1003 also required the loan applicant to declare whether the property sought would be a primary residence, second home, or an investment property. The Form 1003 was generally submitted along with other documents as part of a loan application package. Lenders relied on information on the Form 1003 to determine if and in what amount it would provide the applicant a loan.

b.    A HUD-1 Settlement Statement ("Settlement Statement") was a form prescribed by the United States Department of Housing and Urban Development that includes a schedule of the borrower's and seller's charges in a real estate transaction and the disposition of funds. At closing, the buyer/borrower, seller and closing agent certified that the information contained in the Settlement Statement was true and correct.

c.    Typically, lenders required the closing agent to submit a completed but unsigned preliminary Settlement Statement before the closing as a condition of funding the loan. Lenders relied on the preliminary Settlement Statement when approving and funding loans, and instructed settlement and closing agents to only accept and disburse funds consistent with the Settlement Statement.

d.    A "straw buyer" was an individual who purchased a property for another to conceal the identity of the actual purchaser, usually in exchange for a fee. Typically, straw buyers did not intend to reside in the property to be acquired.

## **Manner and Means of the Conspiracy**

5.    It was part of the conspiracy that the Co-Conspirators convinced the sellers of the Newark Properties to sell their Properties for approximately the value of the underlying mortgages.

6.    It was further part of the conspiracy that VICTOR, ARSENIO, CC-2, and their Co-Conspirators recruited straw buyers for the Newark Properties and obtained their identifying information, including social security cards and drivers' licenses.

7.    It was further part of the conspiracy that in exchange for the use of the straw buyers' identity and credit history, VICTOR, ARSENIO, CC-2, and their Co-Conspirators agreed to pay each of the straw buyers a fee of approximately $5,000 or more, provide the straw buyer's down payment, secure tenants to lease the property purchased and make the mortgage payments on each of the fraudulently obtained mortgages. These secret agreements between the Co-Conspirators and the borrowers were not disclosed to Victim Bank 1.

8.    It was further part of the conspiracy that the Co-Conspirators arranged transactions for the Newark Properties whereby the straw buyers

would nominally purchase the Newark Properties for far more than the sellers had agreed to sell the Properties, and the Co-Conspirators kept the difference between the contract price and the amounts the sellers received.

9.     It was further part of the conspiracy that in accordance with VICTOR's instructions, the straw buyers' information was provided to CASALINHO and was used to prepare false and fraudulent mortgage loan applications, including Forms 1003, to Victim Bank 1 that contained a variety of false statements, including false information about the identity of the purchaser of the property, the income and assets of the straw buyers, and the source of the down payment and cash required for closing.

10.     It was further part of the conspiracy that, based at least in part on the materially false and fraudulent misrepresentations caused by the Co-Conspirators in the loan applications and Settlement Statements, Victim Bank 1 approved the mortgage applications for the Newark Properties and funded mortgage loans for the purchases of the Newark Properties for far more than the sellers had agreed to sell the Properties.  These loans had a total value of more than approximately $5,000,000.

11.     It was further part of the conspiracy that VICTOR, ARSENIO, and CC-2 attended several of the closings on the Newark Properties. SIMOES was the closing attorney on approximately ten of the fraudulent transactions. Prior to the closing of each of those transactions, VICTOR, SIMOES and their co-conspirators made and submitted a false and fraudulent Settlement Statement to Victim Bank 1, which falsely stated that the straw buyer was paying his/her own cash-to-close obligations, including down payments and fees, when in fact they were not.

12.     It was further part of the conspiracy that SIMOES signed and certified as true the final Settlement Statements.  These Settlement Statements falsely stated that the cash required for closing for each transaction came from the straw buyer. In fact, however, VICTOR and his Co-Conspirators provided those funds to SIMOES and the funds were deposited into SIMOES' attorney trust account.

   a.  For certain transactions, Construction Company A was the source of the cashier's checks given to SIMOES to fund the buyer's cash required at closing. For other transactions, the down payment came from an account owned and controlled by ARSENIO, the seller in the transaction, and VICTOR. For yet other transactions, the buyer's cash at closing came from the proceeds of the mortgage loan itself after funding or closing, or from the proceeds of a previously obtained fraudulent loan.

13.     It was further part of the conspiracy that because the loans were funded in amounts greater than the actual sales prices agreed to by the sellers,

SIMOES disbursed a significant portion of the difference to VICTOR, ARSENIO, and/or CC-2 through third parties, including Construction Company A and CC-1.

14.    Each of the mortgage loans on the Newark Properties went into default.

## Representative Transactions

15.    Below is a summary of two of the fraudulent transactions involving Newark Properties.

### 170 Scheerer Avenue

16.    In or around December 2007, VICTOR offered Straw Buyer 1 ("SB-1") approximately $5,000 to purchase one of the Newark Properties, a property located at 170 Scheerer Avenue, in SB-1's name. VICTOR told SB-1 that while alternative financing was sought, the property and loan would remain in SB-1's name for a period of several months and then be transferred out of SB-1's name. VICTOR further represented that he would be responsible for payment of (i) the down payment and all fees associated with the purchase of the property and (ii) the mortgage payments. At VICTOR's direction, SB-1 provided SB-1's personal identification information to an Avanti employee.

17.    In an attempt to obtain a mortgage loan from Victim Bank 1 for 170 Scheerer Avenue, in or about December 2007 and January 2008, CASALINHO, VICTOR, ARSENIO, CC-2, and their co-conspirators submitted Forms 1003 containing false information to Victim Bank 1.

18.    The closing for 170 Scheerer Avenue occurred on or about January 9, 2008. SIMOES served as the closing agent.  Victim Bank 1 wired approximately $469,988.60 in loan funding to an attorney trust account held by SIMOES. The final Settlement Statement submitted to Victim Bank 1 and certified as true and accurate by SIMOES contained false information, including the itemization of approximately $25,450.02 as "Cash from Borrower." A cashier's check, payable to SIMOES's law firm for approximately $25,450.02 and dated on or about January 9, 2008, was purchased with funds from the bank account of Construction Company A and identified, on its face, Construction Company A as the remitter.

19.    The final Settlement Statement included a disbursement of approximately $126,513.99 to CC-1 itemized as "Payoff to CC-1." From that money, Construction Company A received approximately $31,000 and VICTOR received approximately $36,600.  An additional $42,000 of that money funded the cash to close for another Newark Property.

20.     Several months after the closing, the mortgage obtained by VICTOR and his co-conspirators in SB-1's name went into default with an outstanding balance of approximately $400,000.

**172 Scheerer Avenue**

21.     In or around December 2007, VICTOR, ARSENIO and CC-2 offered Straw Buyer 2 ("SB-2") approximately $5,000 (and ultimately paid SB-2 approximately $7,500) to purchase one of the Newark Properties, a property located at 172 Scheerer Avenue, in SB-2's name. VICTOR, ARSENIO, and CC-2 told SB-2 that while alternative financing was sought, the property and loan would remain in SB-2's name for a period of several months and then be transferred out of SB-2's name. VICTOR, ARSENIO, and CC-2 further represented that they would be responsible for payment of (i) the down payment and all fees associated with the purchase of the property and (ii) the mortgage payments. SB-2 provided SB-2's identifying information to one of the co-conspirators.

22.     In an attempt to obtain a mortgage loan from Victim Bank 1 for 172 Scheerer Avenue, in or about February and March 2008, CASALINHO, VICTOR, ARSENIO, CC-2, and their co-conspirators submitted Forms 1003 containing false information to Victim Bank 1.

23.     The closing for 172 Scheerer Avenue took place on or about March 14, 2008. The final Settlement Statement, signed and certified as true and accurate by SIMOES, was submitted to Victim Bank 1. It contained false information, including the itemization of $25,000 as "Cash from Borrower." In fact, the cash to close did not originate from SB-2, but rather from the accounts of Construction Company A and CC-2. On or about March 14, 2008, Victim Bank 1 wired approximately $470,641 to an attorney trust account held by SIMOES to fund the transaction.

24.     The final Settlement Statement included a disbursement of approximately $111,217.65 to Construction Company A. Within two weeks of the disbursement of funds to Construction Company A, disbursements from its bank account were made to Avanti totaling approximately $58,000.

25.     Several months after the closing, the mortgage obtained by VICTOR and his co-conspirators in SB 2's name went into default with an outstanding balance of approximately $290,000.